## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **MICHAEL THULEN JR., et al.**<br><br>Plaintiffs,<br><br>vs.<br><br>**AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, NEW JERSEY COUNCIL 63, et al.,**<br><br>Defendants | DOCUMENT ELECTRONICALLY FILED<br><br><br>Civil Action No. 1:18-cv-14584-RMB-AMD<br>Hon. Renee Marie Bumb<br><br>ORAL ARGUMENT REQUESTED |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR DECLARATORY JUDGMENT

Patrick J. Wright, Esq.
Mackinac Center Legal Foundation
140 W. Main Street
Midland, MI 48642
(989) 631-0900
wright@mackinac.org

Matthew C. Moench, Esq.
Moench Law, LLC
1303 Roger Avenue
Bridgewater, NJ 08807
(908) 208-1910
moenchlawllc@gmail.com

*Attorneys for Plaintiffs*
*Michael Thulen, Jr., Michael Porter, and Terence Gaudlip*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES............................................................................ii

INTRODUCTION ......................................................................................... 1

STATEMENT OF FACTS AND PROCEDURE ....................................... 2

     A.  Union Security Basics.................................................... 3

     B.  New Jersey Public Employee Bargaining Before the WDEA.............. 5

     C.  National Events Related to Right-to-Work and Various United States Supreme Court Cases ................................................. 8

     D.  WDEA .................................................................. 10

     E.  Filing of Suit and Other Procedural Matters............................ 13

ARGUMENT .............................................................................................. 14

    I.  Subject Matter Jurisdiction, Standing, and other Justiciability Concerns ..................................................... 15

    II.  Enforcement of WDEA's Section Six ...................................... 17

    III.  Proper Construction of WDEA's Section Six ............................ 18

    IV.  The Right to Resign and the Right to End Financial Support .................. 20

    V.  Waiver of Constitutional Rights by Contract ............................. 32

     A.  Post-Janus Cases Do Not Properly Apply the Constitutional Waiver Analysis................................................... 35

CONCLUSION ........................................................................................... 40

# TABLE OF AUTHORITIES

## CASES

*Abood v. Detroit Bd. of Educ.*, 431 U.S. 209 (1977) ...............................4, 20, 21, 22

*Belgau v. Inslee*, 2018 WL 4931602 (W.D. Wash. Oct. 11, 2018).........................37

*Belgau v. Inslee*, 359 F.Supp.3d 1000 (W.D. Wash. 2019) ...................................39

*Cohen v. Cowles Media Company*, 501 U.S. 663 (1991) ................................23, 24

*Coltec Industries Inc. v. Hobgood*, 280 F.3d 262 (3d Cir. 2002) ...........................34

*Commc'n Workers of America v. Beck*, 487 U.S. 735(1988)......................................4

*Cooley v. California State Law Enforcement Ass'n*, 2019 WL 331170 (E.D. Cal. Jan. 25, 2019) ....................................................................................................38

*Crockett v. NEA-Alaska*, 367 F.Supp.3d 996 (D. Alaska 2019) ............................34

*D.H. Overmyer v. Frick*, 405 U.S. 174 (1972)......................................................33

*Davenport v. Washington Educ. Ass'n*, 551 U.S. 177 (2007)...................................5

*Debont v. City of Poway*, 1998 WL 415844 (S.C. Cal. 1998) ...................24, 25, 26

*Delaware River and Bay Auth. v. Int'l Org. of Masters, Mates and Pilots*, 45 N.J. 138 (1979) ..........................................................................................................6

*Edwards v. Indiana State Teachers Ass'n*, 749 N.E.2d 1220 (Ind. Ct. App. 2001) ..............................................................................................................26, 27, 28

*Erie Telecomm., Inc. v. City of Erie, Pennsylvania*, 853 F.2d 1084 (3d Cir. 1988) ..................................................................................................................32, 33

*Ex Parte Young*, 209 U.S. 23 (1908)......................................................................17

*Fisk v. Inslee*, 2017 WL 4619223 (W.D. Wash. October 16, 2017).................36, 37

*Fisk v. Inslee*, 750 Fed. Appx. 632 (9th Cir. 2019) ...............................................38

*Fuentes v. Shevin*, 407 U.S. 67 (1972) ..................................................................33

*Harris v. Quinn*, 573 U.S. 616 (2014)......................................................................1

*Knox. v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298 (2012).......................9

*Lillebo v. Davis*, 222 Cal.App.3d 1421 (Cal. Ct. App. 1990) ...............................23

*McCahon v. Pennsylvania Tpk. Comm'n*, 491 F.Supp.2d (2007) ....................28, 29

*New Jersey Tpk. Emp. Union Local 194 of Am. Fed'n of Tech. Eng'rs, AFL-CIO v. N.J. Tpk. Auth.*, 123 N.J. Super. 461 (N.J. Super. App. Div. 1973) ...............7

*Otto v. Pennsylvania State Educ. Ass'n-NEA*, 330 F.3d 125 (2003).......................28

*Pattern Makers' League of North America, AFL-CIO v NLRB*, 473 U.S. 95 (1985) ..............................................................................................................22, 23, 36

*Smith v. Arkansas State Emp., Local 1315*, 441 U.S. 463 (1979).......................5, 22

*Smith v. Superior Court, County of Contra Costa*, 2018 WL 6072806 (N.D. Cal. October 16, 2018)...............................................................................................37

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ...............................................16

*Taylor v. Rhatigan*, 900 N.W.2d 699 (Mich. Ct. App. 2016) ...............................30

## STATUTES

2012 Mich. Pub. Act 349.................................................................1

29 U.S.C. § 186(c)(4).................................................................20

29 U.S.C. §§ 151-169.................................................................6

39 U.S.C. § 1205.................................................................20

45 U.S.C. §§ 151-188.................................................................6

5 U.S.C. § 7115(a)-(b).................................................................20

Ind. Code § 20-7.5-1-6 repealed by 2005 Indiana Acts 951.................28

L. 1968 c. 130.................................................................7

L. 1968 c. 310.................................................................7

L. 1969 c. 233.................................................................7

L. 1977 c. 295.................................................................7

L. 1981 c. 345.................................................................7

L. 2018 c. 15.................................................................1

L. 2018 c. 15 § 2.................................................................10

L. 2018 c. 15 § 3.................................................................11

L. 2018 c. 15 § 4.................................................................12

L. 2018 c. 15 § 6.................................................................13

Mich. Comp. Laws § 423.210(3).................................................................9

N.J.S.A. § 34:13A-1 *et. seq.*.................................................................6

N.J.S.A. § 34:13A-5.12.................................................................10

N.J.S.A. § 34:13A-5.13.................................................................11

N.J.S.A. § 34:13A-5.14.................................................................12

N.J.S.A. § 34:13A-5.3.................................................................6

N.J.S.A. § 34:13A-5.4(c).................................................................8

N.J.S.A. § 34:13A-5.5.................................................................7

N.J.S.A. § 34:13A-5.7.................................................................8

N.J.S.A. § 34:13A-5.9.................................................................8

N.J.S.A. § 34-13A-5.6.................................................................8

N.J.S.A. § 52:14-15.9e.................................................................19

N.J.S.A. § 52-14-15.9e.................................................................12

N.J.S.A. §§ 34:13A-5.4(a), (b).................................................................8

N.J.S.A. §34.13A-1, et. seq.................................................................1

N.J.S.A. §34:13A-5.13(d).................................................................11

Wis. Stat. § 111.70(2).................................................................8

Wis. Stat. § 111.845.................................................................8

## TREATISES

Robert A. Gorman and Matthew W. Finkin, Basic Text on Labor Law
    Unionization and Collective Bargaining (2nd Ed Thomson West 2004)...4, 5

## INTRODUCTION

This case concerns the New Jersey Legislature's attempt to lessen the impact of a constitutional decision on its political allies – labor unions representing mandatory bargaining units in the public sector (specifically, those unions representing public employees organized pursuant to the New Jersey Employer-Employee Relations Act, N.J.S.A. §34.13A-1, *et. seq.*). The intent was to impede public-sector employees who had previously chosen union membership but who now want to become nonmembers after *Janus v. AFSCME Council 31*, 138 S.Ct. 2448, __ U.S. __ (2018).

At a very basic level, the *Janus* ruling is similar to right-to-work laws in that an employee cannot be fired or have other adverse work consequences for failing to provide financial support to the mandatory-collective-bargaining agent – i.e. the union. Recent events in states that have enacted right-to-work laws like Michigan, see generally 2012 Mich. Pub. Act 349, and in those states impacted by the prohibition on agency fees for putative public employees who provide home help, see *Harris v. Quinn*, 573 U.S. 616 (2014), have demonstrated that if not forced to pay agency fees, many public employees will choose to leave the union and end financial support.

With those experiences likely in mind, the New Jersey Legislature passed the Workplace Democracy Enhancement Act ("WDEA"), L. 2018 c. 15, after

*Janus* had been argued, but before it had been decided. Through enactment of the WDEA, the New Jersey Legislature took a number of actions meant to benefit unions, including section six, which was an amendment that limited revocation of dues authorizations to ten days a year when such revocations had previously been permitted at any time.

Plaintiffs, who were union members (not nonmembers who were paying agency fees), filed this suit after *Janus* since they wanted to immediately resign from the union and immediately end all financial support to it. They contend section six of the WDEA is unconstitutional.

The various groups of Defendants have each filed motions to dismiss. They make claims regarding justiciability, whether there is a constitutional right to resign and end financial support, and if so, whether that right was waived. This Court should recognize a right to resign and to end financial support and deny any waiver request as premature.

## STATEMENT OF FACTS AND PROCEDURE

In order to set the context around the passage of the WDEA, some union security basics will be set out below, followed by the general legal landscape surrounding the Employer-Employee Relations Act before the passage of the WDEA. Then some out-of-state events preceding the passage of the WDEA are

identified. The structure and text of the WDEA is then set out. Finally, procedural matters in the instant suit are discussed.

## A.    Union Security Basics

The Union Defendants[1] are seeking to demand financial support from individuals who do not want to affiliate with them. Legal questions surrounding this basic problem have been litigated for many decades, often in specialized bodies, like the National Labor Relations Board and state labor boards (in New Jersey, the Public Employment Relations Commission (PERC)), that presume a fair amount of historical knowledge of past events and of terms. This section of the brief operates as somewhat of a general glossary and provides some neutral analysis of general union motivations.

One leading labor treatise sets forth security from the unions' perspective:

> If all employees were required to join the union, this would protect the union against employer attempts to woo employees away and against "raiding" by other unions; would assure a reliable source of funds for union activities, including collective bargaining and grievance processing, which inure to the benefit of all employees in the unit; would strengthen the union in bargaining (since even reluctant workers might more readily support a strike call because of peer pressure and formal discipline within the union); and would tend to promote stability in the relationship between employer and the

---

[1] These are Defendants American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME"), American Federation of State, County and Municipal Employees, New Jersey Council 63 ("Council 63"), and American Federation of State, County and Municipal Employees, AFL-CIO, Local 3790 ("Local 3790"). Collectively, they will be referred to as "Union Defendants."

union, which sometimes brings more responsible union leadership to the fore but sometimes also entrenches irresponsible leadership. Those often diverging interests of the unions, the employees and the public make "union security" a volatile issue, the treatment of which under the law has followed a complex and evolving path.

Robert A. Gorman and Matthew W. Finkin, Basic Text on Labor Law Unionization and Collective Bargaining (2nd Ed Thomson West 2004) at 897-98 (See Declaration of Matthew C. Moench, Esq., dated June 13, 2019 ("Moench Decl.") at Ex. 1). The term "union security" thus "embraces a number of different kinds of arrangements designed to bolster the membership and finances of a union." *Id*. at 900.

The most stringent form of union security is likely a "closed shop," which requires "employers to hire only persons who were already union members." *Commc'n Workers of America v. Beck*, 487 U.S. 735, 747 (1988). Another stringent form of union security is the "union shop," under which, "an employee must become a member of the union within a specified period of time after hire, and must as a member pay whatever union dues and fees are uniformly required." *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 217 n.10 (1977). A third type of union security is the "agency shop," which "entitles the union to levy a fee on employees who are not union members but who are nonetheless represented by the union in collective bargaining. The primary purpose of such arrangements is to prevent nonmembers from free-riding on the union's efforts, sharing the

employment benefits obtained by the union's collective bargaining without sharing the costs incurred." *Davenport v. Washington Educ. Ass'n*, 551 U.S. 177, 181 (2007). Maintenance-of-membership agreements, meanwhile, require an employee to make a choice at the start of collective bargaining agreement. If that employee chooses membership, he or she remains one during the entire course of the agreement. *Lillebo v. Davis*, 222 Cal.App.3d 1421, 1427 n.4 (Cal. Ct. App. 1990).

A lesser form of union security is the "dues checkoff":

> A dues checkoff provision in itself requires no one to join a union or retain membership in a union, but simply provides that the employer shall deduct from the earnings of those union members who authorize it the periodic membership dues (just as it would for taxes, insurance premiums or charitable contributions) and shall pay that amount directly to the union. The checkoff is commonly utilized in conjunction with some more effective union security provision. It relieves the union of the burden in time and expense of collecting membership dues.

Basic Text on Labor Law at 901 (Moench Decl., Ex. 1).

## B.   New Jersey Public Employee Bargaining Before the WDEA

States do not have to permit mandatory collective bargaining of public sector workers. *Smith v. Arkansas State Emp., Local 1315*, 441 U.S. 463, 465 (1979). Before *Janus*, those states that did choose to permit mandatory bargaining could either require those public employees within the bargaining unit who did not join the union to pay agency fees or permit them not to. This latter choice, where there

is mandatory bargaining but no required union financial support, is generally known as right-to-work. [2]

Mandatory collective bargaining became the law in New Jersey in 1968, with the passage of the Employer-Employee Relations Act. N.J.S.A. § 34:13A-1 *et. seq.* (EERA).[3] As is typical in mandatory-bargaining statutes, the EERA states: "Representatives designated or selected by public employees for the purposes of collective negotiation by the majority of the employees in a unit . . . shall be the exclusive representatives for collective negotiation concerning the terms and conditions of employment of the employees in such unit." N.J.S.A. § 34:13A-5.3. Such a representative negotiates for all employees in the unit: "A majority representative of public employees in an appropriate unit shall be entitled to act for and to negotiate agreements covering all employees in the unit and shall be

---

[2] In the private sector, all 50 states are covered by the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151-169, which sets up a mandatory bargaining requirement for most of the private sector. The NLRA allows states to individually determine whether employees covered by that statute will be right to work. See, 29 U.S.C. § 164(b). The Railway Labor Act, 45 U.S.C. §§ 151-188 also requires mandatory bargaining, but does not allow for right-to-work.

Thus, prior to *Janus*, in the public sector, you had states with no mandatory bargaining, states with mandatory bargaining and no compelled fees (right to work), and states with mandatory bargaining and agency fees. In the private sphere, meanwhile, there is mandatory bargaining across the board and only under the NLRA can states choose to be right to work.

[3] Article I, § 19 of New Jersey's Constitution of 1947, on its own, did not allow for mandatory collective bargaining. *Delaware River and Bay Auth. v. Int'l Org. of Masters, Mates and Pilots*, 45 N.J. 138, 145 (1979).

responsible for representing the interest of all such employees without discrimination and without regard to employee organization membership." *Id.*

Payroll deductions for union dues was enacted in 1968. L. 1968 c. 310 codified at N.J.S.A. § 52:14-15.9e. In its original form, the statute allowed dues authorizations and indicated that "such written authorization may be withdrawn by such person holding employment at any time" and that the withdrawal would take effect at the beginning of the next calendar year – January 1. L. 1968 c. 310. (See Moench Decl., Ex. 2). The second 1969 amendment, L. 1969 c. 233, added a second effective date for dues withdrawals – July 1.[4] (*Id.* at Ex. 3).

Originally, the EERA did not allow for the imposition of agency fees. *New Jersey Tpk. Emp. Union Local 194 of Am. Fed'n of Tech. Eng'rs, AFL-CIO v. N.J. Tpk. Auth.*, 123 N.J. Super. 461 (N.J. Super. App. Div. 1973). In 1979, the New Jersey Legislature enacted a provision allowing agency fees. N.J.S.A. § 34:13A-5.5. (Moench Decl., Ex. 5). As part of this provision, PERC could be petitioned if there is a recalcitrant public employer that would not negotiate over the subject of agency fees. Where PERC found that a majority of those in unit wanted such fees and there was a means for nonmembers to challenge the computation of the agency

---

[4] A 1977 amendment, L. 1977 c. 295, clarified that the collective bargaining agent could limit dues collection to that agent and not to the benefit of other unions. (Moench Decl., Ex. 4). In 1981, L. 1981 c. 345 broadened the category of withholdings that were permissible. This was the last amendment before the WDEA. (Moench Decl., Ex. 6).

fee, then PERC was to "order the public employer to institute a payroll deduction of the representation fee in lieu of dues from the wages or salaries of the employees in the negotiations unit who are not members of the majority representative." *Id*. Payroll deductions of agency fees could also be achieved by a negotiated agreement. *Id*. at § 34-13A-5.6. Any action by the public employer or the employee organization (i.e. union) that discriminated "between nonmembers who pay the said representation fee and nonmembers with regard to the payment of such fee . . . shall be treated as an unfair practice within the meaning of [§ 34:13A-5.4]." *Id*. at § 34:13A-5.7.

PERC has the power to promulgate rules or regulations related to fee deductions. *Id*. at § 34:13A-5.9. It also has "the exclusive power . . . to prevent anyone from engaging in any unfair labor practice listed in [§ 34:13A-5.4]." *Id*. at § 34:13A-5.4(c). Included within those prohibited practices is either a public employer or employee organization: "Interfering with, restraining or coercing employees in the exercise of the rights guaranteed to them by this act." *Id*. at §§ 34:13A-5.4(a), (b).

### C.   National Events Related to Right-to-Work and Various United States Supreme Court Cases

In June 2011, Wisconsin passed Act 10, which included a public-sector-right-to-work component. See, Wis. Stat. § 111.70(2); Wis. Stat. § 111.845. In June 2011, a petition for writ of certiorari was filed in *Harris v. Quinn*. In 2012,

the Supreme Court made clear that it was interested in the First Amendment rights of public employees in mandatory bargaining units who were not members of the union. *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298 (2012). Michigan enacted a public-sector right-to-work law in December 2012. See, Mich. Comp. Laws § 423.210(3). In October 2013, the Supreme Court granted certiorari in *Harris v. Quinn*. At that time, there was some belief that the Supreme Court might not be interested in just home-help workers, but also whether agency fees were permissible for any public employees in a mandatory bargaining unit.

In 1977, in *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209 (1977), the Supreme Court had upheld the use of agency fees in the public sector. The theory was that all workers needed to share the cost of collective bargaining and that political expenditures could be segregated from other union expenses and not charged to nonmembers. *Harris v. Quinn* was decided in June 2014 and the Supreme Court refused to extend *Abood's* acceptance of agency fees to home-help workers while also criticizing the reasoning of *Abood* in general. In June 2015, certiorari was granted in *Friedrichs v. California Teachers Association*, No. 14-915, which was a direct challenge to *Abood. Friedrichs* ended in a four-four tie after Justice Scalia's passing. *Friedrichs*, 136 S.Ct. 1083 (March 29, 2016). In September 2017, certiorari was granted in *Janus*. During this time period discussed immediately above, there was much attention paid to the practical impact on union membership

and finances when members transitioned to nonmember status to take advantage of either right-to-work laws or the *Harris v. Quinn* ruling.[5]

Prior to *Janus*, Defendant AFSCME had surveyed 600,000 of its 1.6 million members and found that many might forgo paying dues if given the opportunity. The survey showed 35% would pay dues "no matter what," 50% were "on the fence," and the remaining 15% were likely not to pay dues.[6]

D.   **WDEA**

On May 18, 2018, the New Jersey Legislature approved the WDEA. Many of that statute's provisions concerned union security. The Legislature found "collective negotiations promote labor stability in the public sector and enhance the delivery and avoid the disruption of public services." L. 2018 c. 15 § 2 codified at N.J.S.A. § 34:13A-5.12. To help unions retain membership levels, the unions were given the right to meet employees on work premises during the work day, the right to access new hires, and the right to access certain contact information on public

_____

[5]   Using data from the Current Population Survey, available at http://data.nber.org/cps/, there are a touch under 5 million state and local public employees who were covered by collective bargaining agreements in states that permitted agency fees. New Jersey has around 320,000, which makes it the state with the fourth most employees in this situation (behind California – around 1,250,000 employees, New York – around 900,000 employees, and Illinois – around 350,000 employees). These numbers are averages of "covered employees" from the CPS from the years 2014 to 2018.

[6]   https://www.bloomberg.com/news/articles/2017-02-16/unionsare-losing-their-decades-long-right-to-work-fight. (See Moench Decl., Ex. 7).

employees in the bargaining unit. L. 2018 c. 15 § 3 codified at N.J.S.A. § 34:13A-5.13. This contact information is due both within 10 days of hire for an individual and then on a 120-day rolling basis for the aggregate list of employees in the unit. *Id.*

Likely being aware that in Michigan, California, Oregon, and Washington third parties had engaged in campaigns informing public employees about right to work (Michigan) and the impact of *Harris v. Quinn* (California, Oregon, and Washington), the New Jersey Legislature made the employee list exclusive to the unions and exempt from public disclosure. N.J.S.A. 34:13A-5.13(d). This exclusion would make it harder for third parties to notify public employees about their rights under *Janus* since these parties would not be able to determine where to contact the affected public employees in New Jersey. Further, by choosing to use anniversary dates rather than a set opt-out time period, it makes it more difficult for outside organizations to inform union members about their options around the time of their opt-out period.[7]

---

[7] If all the employees have the same opt-out time period, no knowledge of employees' individual circumstances is required, and promotional materials can be concentrated around the single time of decision. Use of anniversary dates, however, requires knowledge of an individual's particular circumstance if the goal is to provide that employee with information near his or her decision date.

To further mitigate or prevent membership loss to the unions, the New Jersey Legislature prohibited public employers from "encourage[ing] negotiations unit members to <u>resign or relinquish membership</u> in an exclusive representative employee organization and shall not encourage negotiation unit members to <u>revoke authorization of the deduction of fees</u> to an exclusive representative employee organization." L. 2018 c. 15 § 4 codified at N.J.S.A. § 34:13A-5.14 (emphasis added). To enforce this, public employers can be held liable "for any losses suffered by the organization as a result of the public employer's unlawful conduct." *Id*.

When the New Jersey Legislature chose to amend N.J.S.A. § 52:14-15.9e, which had laid dormant since 1981, it chose to use anniversary dates. N.J.S.A. § 52:14-15.9e was amended to allow electronic signatures for dues authorizations and, central to this matter, the below language in strikeout was removed and the remainder added:

> ~~Any such written authorization may be withdrawn by such person holding employment at any time by the filing of notice of such withdrawal with the above-mentioned disbursing officer. The filing of notice of withdrawal shall be effective to halt deductions as of the January 1 or July 1 next succeeding the date on which notice of withdrawal is filed.~~
> Employees who have authorized the payroll deduction of fees to employee organizations may revoke such authorization by providing written notice to their public employer during the 10 days following each anniversary date of their employment. Within five days of receipt of notice from an employee of revocation of authorization for the payroll deduction of fees, the public employer

shall provide notice to the employee organization of an employee's revocation of such authorization. An employee's notice of revocation of authorization for the payroll deduction of employee organization fees shall be effective on the 30th day after the anniversary date of employment.

L. 2018 c. 15 § 6.

### E.   Filing of Suit and Other Procedural Matters

Plaintiff Terence Gaudlip began his employment as a building inspector for Defendant Township of Lakewood on February 27, 2012. Dkt. No. 1 at ¶ 23. Plaintiff Michael Thulen began the same job on September 10, 2012. *Id.* at ¶ 21. Plaintiff Mike Porter began his employment with Township of Lakewood on September 14, 2015.[8] *Id.* at ¶ 22. At the time of filing, it was believed that all three had signed dues authorization cards, but none have copies.[9]

The original complaint in this action was filed on October 3, 2018. In it, Plaintiffs sought to be able to immediately resign and end financial support to Union Defendants and contended the enactment of section six of the WDEA prevented that. The Governor, Attorney General, and members of PERC, as potential enforcers of section six of the WDEA, were named as defendants in their

---

[8] Union Defendants contend Porter has never been a member despite his being in the bargaining unit. Since this issue has been raised, repeated phone calls and an overnighted letter have not generated a response sufficient to authoritatively answer that contention.

[9] The recent contention about Porter's purported lack of union membership status makes it possible he did not sign a dues authorization.

official capacities. Defendants split into three groups; the Union Defendants, the Attorney General and Governor ("State Defendants"), and members of PERC.

All three filed separate pre-motion dismissal letters in January, 2019. Dkt. Nos. 23, 24, and 27.

On February 28, 2019, Gaudlip sent a dues-revocation letter to the Township of Lakewood and a resignation letter to Local 3790. Dkt. No. 29, Exs. A and B.

An amended complaint was filed on March 4, 2019. Dkt. No. 29. Paragraphs 25 and 26 of the Amended Complaint clarified that Plaintiffs had sought to leave the union and end financial support to it upon the filing of the original complaint. As part of their relief, Plaintiffs had sought to prevent Union Defendants from collecting any dues or fees from the time of filing. *Id.* at 8; see also Dkt. No. 1 at 6-7.

Thulen's last day working for the Township of Lakewood was April 19, 2019.

Three dismissal motions were filed on May 3, 2019. Dkt. Nos. 37, 38, 39.

This document is a response to all three of those motions.

## ARGUMENT

The Defendants' arguments can be generally categorized in the following manner: (1) justiciability – Dkt. No. 37-1 at pp. 4-6, 16-17, Dkt. No. 38-1 at pp. 6-10, and Dkt. No. 39-1 at pp. 9-11; (2) enforcement of the WDEA and Eleventh

Amendment – Dkt. No. 37-1 at pp. 9-16; (3) the proper reading of the WDEA – Dkt. No. 38-1 at pp. 12-15, Dkt. No. 39-1 at pp. 12-18; (4) whether there is a right to resign and end financial support under *Janus* and, if not, whether this Court should recognize such a right independent of that case – Dkt. No. 38-1 at pp. 15-20, Dkt. No. 39-1 at pp. 19-28; and (5) if a right to resign is recognized, whether the existence of purported pre-*Janus* dues authorizations constitute a sufficient waiver to allow collection of dues to continue until the WDEA section six window applies.  Dkt. No. 38-1 at pp. 21-27, Dkt. No. 39-1 at pp. 28-33.

## I.    Subject Matter Jurisdiction, Standing, and other Justiciability Concerns

Each of the three Defendant groups makes a subject matter jurisdiction and standing claim. They claim there is no live case or controversy since Gaudlip is now out of the union and not paying fees, Thulen has taken another job and is not paying fees, and Porter was not listed as a member of the union and no fees or dues were allegedly taken. Dkt. No. 37-1 at pp. 4-6, 16-17; Dkt. No. 38-1 at pp. 6-10; and Dkt. No. 39-1 at pp. 9-11. PERC Defendants make additional claims: (1) there is no indication in the pleadings that plaintiffs attempted to resign and were prevented from doing so by WDEA section six or any of the Defendants; and (2) PERC does not administer WDEA section six and therefore there is no causal connection between the PERC Defendants and the claimed injury. Dkt. No. 37-1 at pp. 4-6.

In making their standing claim, Union Defendants contend "Plaintiffs are not seeking damages." Dkt. No. 38-1 at p. 2. This is incorrect. In both the original complaint and the amended complaint, Plaintiffs seek to "[e]njoin the Defendant Unions from collecting any dues or fees from Plaintiffs if they have not consented to such collection through a clear and informed waiver of their First Amendment rights under *Janus*" and further request this Court to grant "all other relief the Court deems just, proper, and equitable." Dkt. No. 1 at pp. 6-7; and Dkt. No. 29 at p. 8. In hindsight, perhaps this requested relief could have been clearer, but it is certainly implicit from the request to end collection of dues and fees and fits within the just, proper, and equitable request as well. If Plaintiffs are correct that WDEA is unconstitutional, there is no equitable basis for allowing the unions to retain the dues after the case was filed.

Further, in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512-14 (2002), the Supreme Court made it clear that notice pleading was sufficient.

PERC Defendants contend Plaintiffs must have sent a futile request before they could file the instant action. But, the text of section six made it clear that even though Plaintiffs wanted to leave and end financial support they could not do so under state law. In order to leave during the remaining 355 days of the year, a challenge to the 10-day window was necessary.

PERC Defendants' second claim about whether or not it enforces WDEA section six will be discussed below.

## II.    Enforcement of WDEA's Section Six

PERC Defendants contend that PERC does not enforce WDEA section six and, therefore, they should be immune from suit under the Eleventh Amendment. Dkt. No. 37 at pp. 9-16.

As noted above, union security is a "volatile issue" in labor. Union finances and membership go directly to the strength of the union. PERC had the power to impose agency fees and payroll deductions on recalcitrant public employers. If a public employer were to accede to an employee's claim that *Janus* required a new waiver before payroll withdrawals could continue, the union could file an unfair labor practice and/or seek compensation from the public employer to make itself whole. Further, PERC has the power to create rules on fee deductions.

*Ex Parte Young*, 209 U.S. 23 (1908) states that an officer of the state can be made a party to a constitutional challenge where "that . . . officer [has] some connection with the enforcement of the [challenged state statute]" and it is not necessary that the "duty should be declared in the same act which it is to be enforced." *Id*. at 157.

The PERC Defendants are proper parties and do not have Eleventh Amendment immunity.

### III.    Proper Construction of WDEA's Section Six

The State Defendants contend that because section six uses the word "may" instead of "may only" it is not limiting public employees to revoking a dues authorization during that ten-day time period; rather, they claim the employees "may do so at other times as well." Dkt. No. 39-1 at pp. 14-15. It is claimed that the unions and the public employers could agree to a revocation period in a collective bargaining agreement[10] and that employees and the union could agree to a revocation period in a dues authorization. The State Defendants argue: "there is no reason why the Legislature would want to prevent such an agreement even when every relevant party wants one." Dkt. No. 39-1 at p. 17.

First, the most natural meaning of the use of the word "may" is section six is that the employee has an option to either revoke or not revoke during that ten-day period; not that the employee has (a) that option, (b) another potential revocation window under a collective-bargaining agreement, and (c) a last potential window under a dues authorization. Second, the State Defendants contend that the Legislature could have used to the term "may only" and did not. That is correct, but the Legislature also could have written section six to conform to the State Defendants proffered interpretation by adding the following capitalized language –

---

[10] As a reminder, the parties to a collective-bargaining agreement are the union (not the individual employees) and the public employer.

"may revoke such authorization by providing written notice to their public employer during the 10 days following each anniversary date of their employment OR BY TERMS OF A BARGAINING AGREEMENT OR DUES AUTHORIZATION." The Legislature also did not do this. Third, the prior version of N.J.S.A. § 52:14-15.9e allowed a dues revocation to be filed "at any time," so it is apparent that the Legislature's intent was to narrow an employee's options. Fourth, the national events that were occurring around the country in the years prior to passage indicated that a short time frame would limit membership losses to public sector unions and the remainder of the WDEA makes it clear that protecting union membership and finances was a goal of the WDEA.

The State Defendants also raise the issue of retroactivity if Plaintiffs' interpretation of section six is correct. But, retroactivity is not a concern because, as will be discussed below, any dues authorization operating as a waiver of a constitutional right would be analyzed under federal law not state law: the question is not a state law contracts question of whether section six interferes with the purported dues authorization; rather, the question is whether the purported dues authorization operates as a waiver of a constitutional right.

The Union Defendants note that New Jersey does not by statute require individuals to use dues deductions. It is an employee's written request that begins the government deducting dues. The Union Defendants then seek to analogize this

process to federal employee statutes, 5 U.S.C. § 7115(a)-(b) and 39 U.S.C. § 1205 as well as 29 U.S.C. § 186(c)(4) of the NLRA. But, nowhere do the Union Defendants show that any of these statutes have been subjected to and survived a suit that alleges there is a constitutional right to resign and to end financial support under the First Amendment.[11]

## IV.   The Right to Resign and the Right to End Financial Support

Looking at pre-*Janus* resignation cases, in *Knox*, the Supreme Court discussed "the close connection between our Nation's commitment to self-government and the rights protected by the First Amendment." *Knox*, 567 U.S. at 308. In *Abood*, the Supreme Court stated: "For at the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State." 431 U.S. at 234-35 overruled on other grounds by *Janus*, supra. Further, in *Abood*, while the Supreme Court did not prohibit

---

[11] It is an open question whether there is enough state action present under the NLRA to trigger the First Amendment's constitutional protections. *Janus*, 138 S.Ct. at 2479 n.24.

Also, the State Defendants cite to those same statutes, Dkt. No. 39-1 at pp. 27 and n.6, but they too fail to show any case where the statutes have been subjected to and survived a constitutional attack on First Amendment grounds.

It is likely that the constitutional right-to-resign issue has not arisen in those contexts because federal employees have always been right-to-work and therefore, there would not be the pent-up demand that would happen when there is a transition from an agency-fee environment to a right-to-work environment.

nonmembers from having to pay agency fees, it did recognize that there is a First

Amendment interest in not associating with a union:

> The appellants argue that they fall within the protection of these cases because they have been prohibited, not from actively associating, but rather from refusing to associate. They specifically argue that they may constitutionally prevent the Union's spending a part of their required service fees to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representative. We have concluded that this argument is a meritorious one.

*Id.* at 234 (emphasis added). The Supreme Court continued:

> And the freedom of belief is no incidental or secondary aspect of the First Amendment's protections:
>
>> "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia Bd. of Ed. v. Barnette*, [319 U.S. 624, 642].
>
> These principles prohibit a State from compelling any individual to affirm his belief in God, *Torcaso v. Watkins*, [367 U.S. 488], or to associate with a political party, *Elrod v. Burns*, [427 U.S. 347, 363-364, n. 17], as a condition of retaining public employment. They are no less applicable to the case at bar, and they thus prohibit the appellees from requiring any of the appellants to contribute to the support of an ideological cause he may oppose as a condition of holding a job as a public school teacher.

*Abood*, 431 U.S. at 233-34.

In *Abood*, the Supreme Court described the plaintiff set:

> Some of the plaintiffs were Union members and were paying agency-shop fees under protest; others had refused either to pay or to

> join the Union; still others had joined the Union and paid the fees
> without any apparent protest. The agency-shop clause itself prohibits
> the discharge of an employee engaged in litigation concerning his
> service charge obligation until his legal remedies have been
> exhausted, and no effort to enforce the clause against any of the
> plaintiffs has been made.

*Id.* at 212 n.2. The Supreme Court provided no indication that it was denying a

First Amendment claim to those who had chosen membership.

In *Smith*, the Supreme Court noted:

> [T]he First Amendment is not a substitute for the national labor
> relations laws. . . . [T]he fact that procedures followed by a public
> employer in bypassing the union and dealing directly with its
> members might well be unfair labor practices were federal statutory
> law applicable hardly establishes that such procedures violate the
> Constitution.

441 U.S. at 464. Despite this admonition, *Pattern Makers' League of North*

*America, AFL-CIO v NLRB*, 473 U.S. 95 (1985), wherein the Supreme Court

discussed the right to resign under the NLRA, is a useful starting point since those

rare courts that have considered whether there is a First Amendment right to resign

often make reference to it.

In *Pattern Makers'*, the Supreme Court addressed a case concerning a union

bylaw which sought to limit when a member could resign from the union. The

bylaw prohibited resignation during a strike or lockout or when either of those

events appeared imminent. *Id.* at 97. The union was seeking to fine employees who

had resigned during a strike and returned to work.

The Supreme Court considered whether the union's resignation prohibition violated Section 7 of the Act, 29 U.S.C. § 157, which grants employees the right to "refrain from any or all [concerted] . . . activities." *Pattern Makers'*, 473 U.S. at 100. The issue was defined as "whether a union is precluded from fining employees who have attempted to resign when resignations are prohibited by the union's constitution." *Id.* at 101. The Supreme Court noted that its prior cases had left open "the extent to which contractual restrictions on a member's right to resign may be limited by the Act." *Id.* at n.9

The Supreme Court stated that "restrictions on the right to resign" are "inconsistent with the policy of voluntary unionism" found in the NLRA. *Pattern Makers'*, 473 U.S. at 104. The policy behind voluntary unionism is that "allowing employees to resign from a union at any time . . . protects the employee whose views come to diverge from those of his union." *Id.* at 106 (emphasis added). The Supreme Court indicated "restricting the right of employees to resign . . . impairs the policy of voluntary unionism." *Id.* at 107. The Supreme Court concluded by overturning the resignation ban, holding it was "inconsistent with the congressional policy of voluntary unionism." *Id.* at 114.

Both the State Defendants and the Union Defendants cite to *Cohen v. Cowles Media Company*, 501 U.S. 663 (1991) for the proposition that there is not a First Amendment violation here. In that case, the Supreme Court held there was no

First Amendment violation where the enforcement of "generally applicable laws" against the press "has incidental effects on its ability to gather and report the news." *Id*. at 669. For example, the Supreme Court noted: "The press may not with impunity break and enter an office or dwelling to gather news." *Id*. Nor may the press "publish copyrighted material without obeying the copyright laws." *Id*.

The crux of *Cohen v. Cowles Media Company* is that the press does not get heightened First Amendment rights as opposed to regular citizens. It does not stand for the proposition that there can be no First Amendment violation wherever there is a pre-existing contract of some sort.

The first case to consider whether there was a First Amendment-based right to resign from a public-sector union was *Debont v. City of Poway*, 1998 WL 415844 (S.C. Cal. 1998) (Moench Decl., Ex. C). There, the plaintiff challenged a maintenance-of-membership clause in a bargaining agreement that ran eight years. Four years into the agreement, the employee sought to resign his union membership. The union denied the request and indicated he could not leave until one month before the eight-year bargaining agreement expired. *Id*. at *1. The plaintiff also sent a dues revocation to the employer, and the employer continued to take dues out. *Id*.

Plaintiff filed suit and alleged a violation of the First Amendment. The matter was reviewed in a preliminary injunction/temporary restraining order

context. On the merits, the union claimed that the employee voluntarily joined and therefore had no First Amendment claim, however the court rejected this argument:

> [The union] ignore[s] the fact that Plaintiff is being required to remain a member of the union for an extended period of time merely because at some point in the past, he chose to join the union. Whether or not he voluntarily chose to join the union some time ago is not the issue. Plaintiff no longer wishes to be associated with the union, nor to pay to support its activities.
>
> . . .
>
> I find that requiring an employee to maintain membership in a union implicates First Amendment freedom to associate or to refrain from associating with the union.
>
> In this case, it is clear that Plaintiff's First Amendment rights are at issue and may be unconstitutionally infringed by the MOU's requirement that he remain a member of the union until the expiration of the agreement.

*Id.* at 2-3. The trial court continued:

> I would also note that what is at the heart of the First Amendment in this country is the freedom of expression, the freedom of speech, the freedom not to speak, the freedom to associate, the freedom not to associate, and all of which inherently also involve the freedom to change one's mind. That's the great part of the American system, is the right to change your mind.
>
> Now, that is a problem, I see, with this whole agreement, is one is lo[c]ked in for a period of time, up to eight years; in this case, about three and a half years or four years after the Plaintiff chose not to become a member because of this particular agreement.

25

> And I can think of very few provisions that would appear, at least facially, based upon the briefing that's been submitted thus far, to strike so directly into the heart of the First Amendment.
>
> I find, therefore, that Plaintiff has shown he is likely to succeed on his First Amendment claim.

*Id.* at 6.

Alternatively, noting that the pertinent California bargaining law had right-to-refrain language like that in the NLRA and citing *Pattern Makers'*, the court held that plaintiff would also be likely to succeed on the basis of a statutory right to resign. *Id.* at *5.

The trial court entered a temporary restraining order preventing the payroll deduction: "Because Plaintiff's First Amendment rights are implicated by the payroll deduction, . . . I find the balance of hardship on that tips sharply in Plaintiff's favor. . . . I am granting the temporary restraining order to Plaintiff on this matter." *Id.* at *6.

In *Edwards v. Indiana State Teachers Association*, 749 N.E.2d 1220 (Ind. Ct. App. 2001), the Indiana Court of Appeals rejected the idea that public school teachers had a constitutional right to resign from their public-sector unions at any time. Viewing the matter as one of contract law, between a voluntary association (the teachers' union) and its members, the Court of Appeals indicated that the union's constitution and bylaws became the terms of the contract. That union's

constitution contained a provision that limited resignations from the union to the month of August. *Id.* at 1227.

The court rejected the concept that *Pattern Makers'* should control, noting that it was a statutory and not a constitutional case. *Edwards*, 749 N.E.2d at 1227-28. The Indiana Court of Appeals based its holding – rejecting a First Amendment right to resign – on *Abood*:

> Despite their reliance on *Pattern Makers'*, the Teachers do present an argument not without some merit. Their claim: The First and Fourteenth Amendments guarantee them the right to resign their membership at any time. . . .
>
> Like all rights, the right of association is not absolute. . . . The U.S. Supreme Court has held that requiring nonmember financial support of a teachers association does not violate the First Amendment. [*Abood*, 431 U.S. at 222]. Though such an arrangement "has an impact on [nonmember] First Amendment interests," *id.*, this impact is justified by the social utility of exclusive bargaining representatives and the extent of their operating costs. . . .
>
> The thirty-day window is similarly defensible. If the forced payment of fair share fees by *nonmembers* passes constitutional muster, then how much more the continuing membership duties of those who *voluntarily* join a teachers association. Because the teacher associations' tasks are so manifold and of great public importance, they must have some way of reliably budgeting their resources. The thirty-day window allows teacher associations to forecast membership for each school year, calculate revenue, and allocate resources accordingly. If school employees could resign membership at any time, the teacher associations would lose the ability to allocate resources effectively. The resulting fiscal uncertainty would jeopardize the teacher associations' statutory mission to bargain collectively on behalf of school employees.
>
> . . . In the instant case, the Teachers have a thirty-day window each year to revoke membership in an organization they voluntarily joined. We believe that this procedure is carefully tailored to minimize the limited infringement on [] their First Amendment rights.

*Edwards*, 749 N.E.2d at 1228-29 (emphasis in original).

At the time, Indiana had a right-to-work provision for teachers. Ind. Code § 20-7.5-1-6 repealed by 2005 Indiana Acts 951. The court indicated that the plaintiff teachers "were not compelled to join the teachers association or financially support them. Each one voluntarily joined and agreed to abide by the procedure for revoking membership." *Edwards*, 749 N.E.2d at 1229.

In *Otto v. Pennsylvania State Education Association-NEA*, 330 F.3d 125 (2003), in the context of deciding whether certain items were chargeable to nonmembers under *Abood*, the Third Circuit stated: "The First Amendment affords public-sector employees the freedom not to associate with a labor union." *Id*. at 128.

In *McCahon v. Pennsylvania Turnpike Commission*, 491 F.Supp.2d (2007), a preliminary injunction was sought when a public employee tried to resign from a union despite the collective bargaining agreement containing a maintenance-of-membership clause. The agreement spanned three years and prohibited the employee from resigning until 15 days prior to its end. *Id*. at 525. The plaintiff filed suit with about 6 months left on the bargaining agreement. *Id*. at 526.

In analyzing the likelihood of success on the merits, the District Court noted there was "a dearth of case law on the issue of whether 'maintenance of membership' provisions violate the First Amendment." *McCahon*, 491 F.Supp.2d

at 526. The court held that union members likely have a constitutional right to leave the union:

> In the matter sub judice, the "maintenance of membership" provision locks plaintiffs into union membership for the duration of the CBA—the only way plaintiffs can resign from the union is to leave their employment. See, e.g., [*Debont v. City of Poway*]. Despite plaintiffs' apparent disagreement with the Union's ideology or politics, the "maintenance of membership" provision forces their continued membership. And the Union continues to collect full union dues from plaintiffs. . . . Thus, the "maintenance of membership" provision may have a direct and deleterious impact on plaintiffs' rights under the First Amendment. Although [*Otto v. Pennsylvania State Education Association-NEA*] and other similar cases involve non-members' First Amendment right not to associate, the court finds that plaintiffs are reasonably likely to succeed in extending this right to union members who are unable to resign unilaterally because of a "maintenance of membership" provision.

*Id.* at 527. The court entered the injunction. *Id.* at 529.

The key question – recognized in the statutory concept of voluntary unionism in *Pattern Makers'* and the First Amendment discussion in *Debont* and *McCahon* – is to what extent individuals are able to change their minds about union membership. When a union endorses a candidate the employee abhors, must the employee maintain membership? When the union speaks on a public issue of the day (e.g. abortion, gun control, race relations, religion, etc.) and the employee disagrees, must membership be maintained? A union member cannot predict into the future every position or action the union may take, and union membership should not compel a union member to continue to associate with speech or actions

that member does not agree with. A holding that there is no constitutional right to resign could eventually subject employees to multi-year union support contrary to the employee's wishes. Perhaps the next time the New Jersey amends the WDEA, it could say that public employees must maintain membership for the full extent of any collective-bargaining agreement. Again, the bargaining agreement in *Debont* was eight years long. While the New Jersey Legislature has provided an annual short ten-day window in the current legislation, without a constitutional right, there is no limiting principle.[12]

*Debont* and *McCahon* better encapsulate the important First Amendment interests identified by the Supreme Court about free will and individual beliefs free of state coercion. *Edwards*, meanwhile, is based on that portion of *Abood* that has been overturned – i.e. that individual limitations on the First Amendment rights of public-sector employees are tolerated due to the purported importance of the role of public sector unions and the need to provide adequate funding for them. *Janus'* rejection of that portion of *Abood* makes *Edwards* unpersuasive.

This Court should recognize that there is a First Amendment right to resign from and to also end financial support to public-sector unions.

---

[12] This is not a hypothetical concern. When Michigan went right-to-work the law did not take effect for a couple of months and existing contracts were grandfathered in. Some school districts entered into ten-year collective bargaining agreements to keep agency fees in effect for that period. See, *Taylor v. Rhatigan*, 900 N.W.2d 699 (Mich. Ct. App. 2016).

An <u>entirely independent and distinct</u> basis for this holding would be *Janus* itself. There, the Supreme Court stated:

> This procedure violates the First Amendment and cannot continue. Neither an agency fee nor any other payment to the union may be deducted from a nonmember's wages, nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay. By agreeing to pay, nonmembers are waiving their First Amendment rights, and such a waiver cannot be presumed. Rather, to be effective, the waiver must be freely given and shown by "clear and compelling" evidence. Unless employees clearly and affirmatively consent before any money is taken from them, this standard cannot be met.

*Janus*, 138 S.Ct. at 2486. It is true that most of the *Janus* opinion speaks in the context of nonmembers, but the last sentence can be read in a broader fashion.

Under either the scenario of this Court recognizing that independent of *Janus* there is a freestanding constitutional right to resign from a union and end financial support to it, or under a holding where the broad reading of "employee" in *Janus* itself provides that right, unions would need a post-*Janus* waiver to allow for financial support to continue after a resignation. Union Defendants contend this would make the "the choices made by millions of public employees . . . to become members and pay dues before *Janus* . . . void and of no legal effect." Dkt. No. 38-1 at p. 21. Union Defendants overstate the effect. They may continue seeking dues from anyone that choses membership. But, under the waiver test below, to prevent a resignation from leading to an immediate end to financial support, the unions will need new language post-*Janus* that meets that test.

31

## V.   Waiver of Constitutional Rights by Contract

The issue of waiver of a constitutional right is discussed here before the recent post-*Janus* decisions about resignation windows since most of those cases improperly conflate two separate questions: (1) whether such a right exists; and (2) whether that right was been waived.

Further, in the instant matter, any discussion of waiver will be largely an abstract discussion, since the question before this Court is at motion-to-dismiss stage and Plaintiffs do not have a copy of any dues release they might have signed. It is quite difficult to analyze a hypothetical document when, as will be seen below, the test requires analysis of individual facts and circumstances making it clear that the party making the waiver did it of their own volition.

In *Erie Telecommunications., Inc. v. City of Erie, Pennsylvania*, 853 F.2d 1084 (3d Cir. 1988), the Third Circuit discussed waiver of constitutional rights by contract. It held that the question was not one of state contract law, but rather "a federal question controlled by federal law." *Id.* at 1094 (citation to quote omitted). The Third Circuit stated that "waivers must be voluntary, knowing, and intelligent" and "established by 'clear' and 'compelling' evidence." *Id.* (citations omitted). It was explained that "waiver is ordinarily an intentional relinquishment of a known right or privilege" and that the Supreme Court "has instructed courts to 'indulge in every reasonable presumption against waiver' of fundamental rights and . . . '[not

to] presume acquiescence in the loss' of such rights." *Id.* at 1095 (citations omitted). The Third Circuit noted the particular facts and circumstances surrounding a case "including the background, experience and conduct" of the waiving party helps determine "whether a constitutional right has been waived." *Id.* (citations omitted).

The Third Circuit then analyzed two Supreme Court waiver cases – *D.H. Overmyer v. Frick*, 405 U.S. 174 (1972) and *Fuentes v. Shevin*, 407 U.S. 67 (1972). The Third Circuit summarized those holdings:

> Taken together, *D.H. Overmyer* and *Fuentes* stand for the proposition that constitutional rights, like rights and privileges of lesser importance, may be contractually waived where the facts and circumstances surrounding the waiver make it clear that the party foregoing its rights has done so of its own volition, with full understanding of the consequences of its waiver. Such volition and understanding are deemed to be, and indeed have been held to be, present, where the parties to the contract have bargaining equality and have negotiated the terms of the contract, and where the waiving party is advised by competent counsel and has engaged in other contract negotiations.

*Erie Telecomm., Inc.*, 853 F.2d at 1096.

When it is the appropriate time to perform the analysis – i.e. at the summary-judgment stage after any alleged dues authorization form has been provided to Plaintiffs (again, Plaintiffs believe they signed such a document but have no copy

of it) – Union Defendants will have some large hurdles to clear.[13] In particular, as a matter of law, it will be difficult for them to show that there was bargaining equality. Unions, in large part, exist to bargain for their members. It would be incongruent for an entity that exists to provide expertise for workers to bargain with management to then claim that there is no imbalance when it negotiates dues authorizations against those same workers. In this case, the Plaintiffs are (or were) building inspectors. It is unlikely that any of them possess the knowledge of labor law and constitutional law possessed by the lawyers at Defendant AFSCME or Defendant Council 63, who Plaintiffs presume drafted whatever version of the dues authorization that Plaintiffs believed they signed.

Equity of bargaining position is part of what distinguishes *Coltec Industries Inc. v. Hobgood*, 280 F.3d 262 (3d Cir. 2002) and the plea agreement cases, both of which are referred to by both State Defendants and Union Defendants. *Id.* at 275 (Coltec . . . deliberately chose to negotiate away its constitutional claims while actively represented by competent counsel). Further, these cases all involve lawsuits or criminal cases where agreements were reached and thus the interest is in having an end to litigation. *Coltec*, 280 F.3d at 276.

---

[13] In *Crockett v. NEA-Alaska*, 367 F.Supp.3d 996 (D. Alaska 2019), the trial court rejected a contention that a motion to dismiss was improper where a contract has not been described or referenced in the complaint. *Id.* at 1018. To the extent this case is in conflict *Erie Telecomm.*, binding Third Circuit precedent controls when contrasted by a District Court opinion from another state.

It is unlikely that Union Defendants are going to be able to show a proper constitutional waiver when this test is eventually applied.

## A. Post-Janus Cases Do Not Properly Apply the Constitutional Waiver Analysis.

The unions in *Pattern Makers'* argued that under contract principles, Plaintiffs must resign on the unions' terms. This argument was considered and rejected. The Supreme Court cautioned that some rudimentary contract principles may not translate into the labor context:

> Justice BLACKMUN's dissent suggests that the relationship between a union and its members should be governed by contract law. The rationale of this theory is that a member, by joining the union, "enters into a contract, the terms of which are expressed in the union constitution and by-laws." Summers, Legal Limitations on Union Discipline, 64 Harv.L.Rev. 1049, 1054 (1951). [*NLRB v Marine & Shipbuilding Workers*, 391 US 418 (1968)] shows, of course, that union discipline cannot be analyzed primarily in terms of the common law of contracts.

> The dissent repeatedly refers to the "promise" made by the employees involved in this case. Because they were members of the union when [the resignation restriction] was adopted, the dissent reasons that the employees "promised" not to resign during a strike. But the "promise" to which the dissent refers is unlike any other in traditional contract law. As a commentator has recognized:

> > "Membership in a union contemplates a continuing relationship with changing obligations as the union legislates in monthly meetings or in annual conventions. It creates a complex cluster of rights and duties expressed in a constitution. In short, membership is a special relationship. It is as far removed from the main channel of contract law as the relationships created by marriage, the purchase of a stock certificate, or the hiring of a servant."

Summers, supra, at 1055–1056.

*Pattern Makers'*, 473 U.S. at 113 n.26.

In *Fisk v. Inslee*, 2017 WL 4619223 (W.D. Wash. Oct. 16, 2017) (Moench Decl., Ex. D), the trial court considered a situation where a union would allow a member to resign at any time, but if they had signed a dues authorization card the union would hold them to the window for ending financial support (it would, however, apply an out-of-time revocation at the next available window without any further action of the employee and not roll the employee over for a year). *Id*. at *4. The dues authorization card allowed the union to withdraw dues or fees, was irrevocable for a year, and had a revocation window 30 to 45 days before the anniversary date of the authorization. *Id*. at *3.

The court held there was no "freedom of speech" or "freedom of association" interest that could overcome the "freedom to contract":

> The freedom to contract is rooted in the due process clause of the Fifth and Fourteenth Amendment. It is the bedrock upon which the economic engine provides the goods and services necessary for a thriving society. A worker has every right to voluntarily associate with a union in order to promote better working conditions and wages. Correspondingly, a worker can refuse to associate with or join a union. That is her prerogative. But, once she joins voluntarily, in writing, she has the obligation to perform the terms of her agreement. The freedom of speech and the freedom of association do not trump the obligations and promises voluntarily and knowingly assumed. The other party to that contract has every reason to depend on those promises for the purpose of planning and budgeting resources. The

Constitution says nothing affirmative about reneging legal and lawful responsibilities freely undertaken.

*Fisk*, 2017 WL 4619223 at *5.

*Janus* was decided on June 27, 2018.

In *Belgau v. Inslee*, 2018 WL 4931602 (W.D. Wash. Oct. 11, 2018) (Moench Decl., Ex. A), at the preliminary-injunction stage, the court considered a dues authorization form that indicated absent a collective bargaining provision making the period longer (e.g. for the entire term of the collective bargaining agreement – essentially a maintenance of membership agreement) the default-revocation provision was one year with a 10-day window 10 to 20 days before the anniversary of the authorization. *Id.* at *2.

In part based on the liberty-of-contract language from *Fisk*, the court held the employees had to continue to pay the union despite their out-of-window attempt to resign. *Belgau*, 2018 WL 4931602 at * 5.

In *Smith v. Superior Court, County of Contra Costa*, 2018 WL 6072806 (N.D. Cal. Oct. 16, 2018), (Moench Decl., Ex. E) the trial court rejected a challenge to a 1-year dues authorization. It cited *Cohen v. Cowles Media Co.*, which is not a waiver case, and in essence held there was not a First Amendment right to resign due to its interpretation of that decision.

In *Fisk v. Inslee*, 750 Fed. Appx. 632 (9th Cir. 2019), the Ninth Circuit upheld the above 2017 lower court decision and it stated:

Appellees' deduction of union dues in accordance with the membership cards' dues irrevocability provision does not violate Appellants' First Amendment rights. Although Appellants resigned their membership in the union and objected to providing continued financial support, the First Amendment does not preclude the enforcement of "legal obligations" that are bargained-for and "self-imposed" under state contract law. *Cohen v. Cowles Media Co.*, 501 U.S. 663, 668-71, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991). The provisions authorizing the withholding of dues and making that authorization irrevocable for certain periods were in clear, readable type on a simple one-page form, well within the ken of unrepresented or lay parties. Moreover, temporarily irrevocable payment authorizations are common and enforceable in many consumer contracts—e.g., gym memberships or cell phone contracts—and we conclude that under state contract law those provisions should be similarly enforceable here.

*Id.* at 633-34.

In *Cooley v. California State Law Enforcement Association*, 2019 WL 331170 (E.D. Cal. Jan. 25, 2019) (Moench Decl., Ex. B), implicitly it appears the court was considering a maintenance-of-membership clause. The trial court stated:

Mr. Cooley could have properly resigned from the Union in June 2016 (during the CBA-provided window), but he did not do so and thus, in effect, chose to remain in the Union. Under the current CBA, Mr. Cooley can resign as of June 1, 2019 and [his collective bargaining agent] has indicated it would honor his resignation at that time. Until then, Mr. Cooley remains obligated to pay the union dues to which he agreed.

*Id.* at *2. Thus, in *Cooley*, the trial court held that an employee could not resign at any time except the short window in the collective bargaining agreement. This holding was contrary to those in *Debont* and *McCahon* and no mention was made of either case.

38

In *Belgau v. Inslee*, 359 F.Supp.3d 1000 (W.D. Wash. 2019), the trial court repeated some of the analysis it had made at the preliminary-injunction determination. It added a ruling that no state action on either the union or government's part was present when a union pursuant to collective bargaining agreement, had the state collect payments for the union's benefit that plaintiffs contended were in contravention of the First Amendment. *Id.* at 1012-15.

None of the post-*Janus* cases cite *Debont*. None cite *McCahon*. So none appear to have properly considered whether there is a constitutional right to resign and to end financial support. The Supreme Court has made it clear that an individual's right to have and change opinions are core matters of the First Amendment. To the extent that any dues authorization is relevant, it is not to the question of whether or not a First Amendment interest is at stake; rather, it goes to the question of whether that interest has been properly waived.

## CONCLUSION

This Court should deny the three motions to dismiss. It should also recognize that there is a constitutional right to resign and end financial support at any time.

DATED: June 14, 2019    Respectfully submitted,

           MOENCH LAW, LLC
           1303 Roger Avenue
           Bridgewater, NJ 08807

     By: /s/ Matthew C. Moench
        Matthew C. Moench, Esq.

        Patrick J. Wright, Esq.
        Mackinac Center Legal Foundation
        140 W. Main Street
        Midland, MI 48642
        (989) 631-0900
        wright@mackinac.org
        Admitted *Pro Hac Vice*

        *Counsel for Plaintiffs*